A08A0583. BUNCH v. BYINGTON et al.

(664 SE2d 842)

ADAMS, Judge.

Edna M. Pittman died testate on June 19, 2001, survived by four daughters and several grandchildren, two of whom are mentioned in the will, Mary Lynette Ross Bunch and David Ross. Seven months prior to her death Pittman granted Bunch authority to transfer 18,691 shares of General Electric ("GE") stock to herself, which,

Bunch claims, was a gift. Bunch's three aunts and her brother, however, contend the stock was entrusted to Bunch to distribute in accordance with Pittman's will. They and the estate brought separate suits, which were consolidated for trial, and a jury found that Bunch had improperly converted the shares to her own use. Bunch appeals and raises several enumerations of error, including that the trial court should have granted her motion for directed verdict.

"A directed verdict is authorized only when there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions, demands a particular verdict." (Footnote omitted.) *H. J. Russell & Co. v. Jones*, 250 Ga. App. 28-29 (550 SE2d 450) (2001).

Construed in favor of the verdict, the evidence shows that Pittman executed a will on April 27, 1998 that provided that upon her death her GE stock would be distributed to her daughters and granddaughters (either under the will or through a living trust) as follows: 2,000 shares each to Bunch and Pittman's four daughters — Loretta Jean Freeman, Shirley Ann Billingsley, Willie Clyde "Dean" Pruitt, and Betty Lou Holder (Bunch's mother) — and 616 shares to Bunch's brother David Ross; any shares in excess of 10,616 were to be divided equally among the four daughters and two grandchildren. Ross stood to receive Pittman's home as well. The will named James S. Garner III as executor. Pittman held the stock in the form of physical stock certificates.

Starting in the year 2000, Pittman, Ross, and Bunch met to discuss how Garner stood to receive 12% of the stock value as part of his fee as executor. Then, on November 6, 2000, the day before she was to have major surgery, Pittman wrote to Garner, in a letter typed by Bunch, and informed him that she intended to replace him as executor with Bunch and Ross. In the letter Pittman stated, "If I survive this procedure on November 7th, 2000, then I will personally come into your office and sign whatever I need to sign. . . ." She also wrote that "[Bunch] knows what to give back to my children and I do not believe she will try to take anything that is not hers, and will make sure what is to go to the right person." On the same day, Pittman and Bunch executed a "Stock or Bond Power Form," which authorized the transfer of the 18,691 shares of GE stock to Bunch, although there is no indication that the shares were actually transferred to Bunch's name at that time on the books at GE.[1] Pittman

---

[1] The date following Edna M. Pittman's signature appears to be altered from November 6, 2000 to October 6, 2000. Construing the evidence in favor of the verdict, we read this date as November 6, 2000.

lived eight more months without amending her will to reflect any distribution of the GE stock to Bunch.

In early 2001, Pittman reminded Ross that he was going to receive less stock than the others because he was going to get her house. And prior to her June 2001 death, Pittman apologized to a different grandchild regarding how he was not going to receive anything and explained that "she was going to take care of the girls and David."

In December 2001, six months after her grandmother's death, Bunch, acting as an executor of her grandmother's estate, ineffectively attempted to transfer the GE stock to her mother, her three aunts, her brother, and, notably, to herself, in apparent accordance with the terms of Pittman's will. Together with a cover letter, Bunch enclosed the original stock certificates totaling 18,691 shares, which still bore Pittman's name, and she referred to the six recipients as "Legal Heirs." She and David Ross signed one "Stock or Bond Power Form" for each of the recipients as follows: 616 shares for Ross, and 2,000 shares each for herself, her mother, and her three aunts, for a grand total of only 10,616 shares. She enclosed a voided check from Pittman's account at SunTrust Bank, "so that you can wire transfer the balance from the certificates to her bank account." The cover letter also refers to an enclosed "Affidavit of Domicile" dated October 23, 2001, in which Bunch averred that she was acting as the executor or administrator of her grandmother's estate and was making the affidavit

> for the purposes of securing the transfer or delivery of property owned by the decedent at the time of his/her death to a purchaser or the person or persons legally entitled thereto under the laws of the decedent's domicile and that any apparent inequality in distribution has been satisfied or provided for ou[t of] other assets of the Estate.[2]

Bunch admitted at trial that by this affidavit, she had sworn that Pittman still owned the stock as of October 23, 2001.

Bunch failed, however, to properly execute the "Stock or Bond Power Forms" as required by certain stock transfer requirements (not relevant to this appeal). And she did not include the November 6, 2000 "Stock or Bond Power Form" issued by Pittman to her. She apparently sent the package to The Bank of New York, because, in January 2002, the "Legal Transfer Department" of that bank denied the transfers because they were not properly executed in accordance

---

[2] The affidavit also states that the above language "can be disregarded if transfer is made to another executor administrator surviving joint tenant or for the purpose of sale."

with stock transfer requirements. The letter also asked Bunch what she would like to do with the remaining 8,075 shares. Bunch never attempted to re-execute the documents to effect the transfer.

In March 2002, Garner, as executor, petitioned to probate the will and noted that Pittman had indicated her intent to replace him as executor but also noted that the replacement was never formalized. Accusations soon arose suggesting Bunch was engaged in fraud and conversion regarding the stock and the estate generally, and, sometime thereafter, Bunch "changed her mind" and decided not to transfer the stock to her relatives. At a probate hearing, she was overheard to say, "if they want to be that way I'll play hardball. . . . I'll tell everybody that the stock was a gift to me and won't nobody get anything." And at some point Bunch admitted to Ross that Pittman had not transferred the stock to her as a gift. Finally, in June or July 2002, Bunch transferred the stock from the name of Edna Pittman to herself; she then sold the stock for $415,444.72 and deposited the proceeds into a Swiss bank account. At trial, she claimed to have spent the money within six months. A flurry of legal activity followed, which ultimately culminated in this trial and judgment against Bunch.[3]

The jury returned a special verdict for the plaintiffs, finding that (1) Pittman did not make a gift to Bunch of her General Electric stock; (2) Bunch knowingly and with intent to commit fraud converted and transferred funds of the estate to herself and for her own use; (3) a constructive trust should be imposed upon the proceeds of the stock and checking account; (4) damages should be awarded in the amount of $623,560.14 to reimburse the estate for the value of the stock on the date of Pittman's death along with $57,000 in attorney fees and expenses; and (5) punitive damages should be awarded. Following a bifurcated hearing, the jury awarded punitive damages in the amount of $20,000. In its order entering final judgment the trial court ordered that the plaintiffs have judgment against Bunch in the principal amount of $623,560.14 plus attorney fees and expenses of litigation in the amount of $57,000, punitive damages of $20,000, and costs and interest.

---

[3] This case originated with a complaint filed by Ross and Neil Freeman, Pittman's son-in-law, as executors of the estate. They were removed as executors by the Probate Court of Floyd County. After their removal, William Byington was named by the court as Administrator CTA of the estate and substituted as the plaintiff. Ross then filed a second action along with his aunts Freeman, Billingsley, and Pruitt, together representing four of the six beneficiaries of Pittman's will. Pittman's other daughter and beneficiary, Betty Holder, Ross and Bunch's mother, is not a party to the suit. The two cases were consolidated just prior to trial by agreement of the parties.

1. Bunch contends the trial court erred by failing to grant her motion for directed verdict.[4] In five enumerations of error, she contends there is no evidence supporting the jury's finding of conversion due to fraud or evidence to support the finding of a constructive trust. We first address two preliminary matters.

(a) The enumerations regarding Pittman's checking account are moot because no judgment was entered against her regarding that account. At trial, evidence was presented to show that after Pittman's death, Bunch wrote several large checks to herself or "cash" drawn on Pittman's account, and it was alleged that Bunch had acted improperly in so doing. But in colloquy with the court, the parties apparently conceded that no evidence had been presented regarding whether the account was a joint account or a joint account with rights of survivorship. Accordingly, the court did not instruct the jury on the account. The jury awarded damages only on the value of the stock at the time of Pittman's death. And although the jury indicated that it "impose[d] a constructive trust upon the proceeds of the stock and checking account," in its final judgment entered upon the verdict, the court did not impose a constructive trust on any property; it entered an award of damages only.[5] There has been no cross appeal on this point, and the appellees state that they are not responding to these enumerations.[6]

(b) Bunch's argument regarding the evidence relies in part on the assertion that the pleadings only assert, and that the jury only found, conversion on the date of the alleged stock gift in November 2000, for which there is no evidence of any associated fraudulent misrepresentation by Bunch. But the record reflects that much more

---

[4] After the appellees rested their case, Bunch moved for "summary judgment" but argued that there was no evidence to support the plaintiffs' claims. The fact that Bunch did not use the phrase "directed verdict" does not negate that the timing and substance of the motion met the requirements of a motion for a directed verdict. Under Georgia law, substance, not mere nomenclature, controls. See *Brown v. Adams*, 233 Ga. App. 813 (506 SE2d 135) (1998).

[5] After setting forth the verdict form, the court stated:
Based upon the special Verdict of the jury it is:
HEREBY ORDERED that the Plaintiffs have judgment against the Defendant, LYNETTE ROSS BUNCH, AND IT IS FURTHER ORDERED that the Judgment be a Final Judgment against said Defendant in the principal amount of $623,560.14; attorney fees and expenses of litigation in the amount of $57,000, punitive damages of $20,000.00, and $210.00 Cost, Total Amount $700,770.14, with future interest upon said principal amount from date of Judgment at the rate as provided in OCGA 7-4-12 (a).
This also resolves Bunch's contention that a constructive trust cannot be imposed because there is no evidence of what the trust or trusts are supposed to hold.

[6] "A judgment must conform to the verdict (OCGA § 9-12-9); and likewise it must follow the true meaning and intent of the finding of the jury." (Citations and punctuation omitted.) *C&S/Sovran Corp. v. First Fed. Sav. Bank of Brunswick*, 266 Ga. 104, 108 (3) (463 SE2d 892) (1995).

was presented to the jury. At the hearing on the motion for directed verdict, the court stated that it was allowing the pleadings to conform to the evidence, to which there was no objection. And, following the presentation of the evidence, the court charged the jury on the law of gifts; actual and constructive fraud; confidential relationships; trusts in property; implied trusts; constructive trusts; fiduciary duty; attorney fees; and punitive damages. Bunch did not object to these charges at trial, and she raises only one issue regarding one jury charge as will be shown below. Therefore, "as to these issues, the pleadings were amended implicitly pursuant to the provisions of OCGA § 9-11-15 (b)." *Rockdale Body Shop v. Thompson*, 222 Ga. App. 821, 823 (2) (476 SE2d 22) (1996). Furthermore, the verdict form, to which Bunch also agreed, does not limit any alleged fraudulent conversion to November 2000. The first two questions state:

> Did Edna Pittman make a gift to Mary Lynette Bunch of all of her General Electric stock on October 6, 2000?
> Did the defendant, knowingly and with intent to commit fraud, convert and transfer funds of the estate of Edna M. Pittman to herself and for her own use?

The second question is not limited to the date found in the first question. The jury responded "no" to the gift, and "yes" to the conversion. As shown below, we find that the evidence supports the case presented to and ruled upon by the jury.

(c) Under the case submitted to the jury, and construing the evidence and all inferences therefrom in favor of the verdict, we find that some evidence was presented to show that Pittman entrusted Bunch with authority over the GE stock in order to ensure that Pittman would not lose 12% of the value of the stock, in the form of an executor fee for Garner, in the event she died during surgery on November 7, 2000.[7] Although she had indicated that she intended to make Bunch and Ross her executors, which would have obviated the need to give Bunch power over the stock on that day, Pittman's letter of November 6, 2000 reflects that she herself knew that she had not formally dismissed and replaced Garner. (Indeed, it was Garner who initially petitioned to probate Pittman's will.) She indicated that if she survived the surgery, she would come to Garner's office to effect the change. Thus, the transfer of power over the stock to Bunch on

---

[7] "In all cases in which a trust is sought to be implied, the court may hear parol evidence of the nature of the transaction, the circumstances, and the conduct of the parties, either to imply or rebut the trust." OCGA § 53-12-94. See also *Epps v. Wood*, 243 Ga. 835, 839 (2) (257 SE2d 259) (1979).

that day served the purpose of placing the stock outside of the estate immediately, i.e., prior to her possible death during surgery, at a time when Garner was in fact still the executor.

There was also evidence to support that this power over the stock was granted under either an express or implied agreement that Bunch would hold the stock power only for the purpose of distributing the stock to the heirs as provided by the will and/or the living trust. In the November 6, 2000 letter, Pittman indicated that "[Bunch] knows what to give back to my children." Indeed, Bunch did not convert the stock to her own name while her grandmother was alive. And Pittman thereafter continued to make statements suggesting that the original distribution plan was still in place. Then, after Pittman's death, Bunch ineffectively sought to transfer the stock to the "legal heirs" essentially in accord with the dictates of the will. She obtained Ross's signature on the transfer documents, which accords with Pittman's intent to make Ross a co-executor and accords with the implied trust that the executors distribute the shares in accordance with the testamentary intent.

Finally, there was evidence that during the summer of 2002 after questions and accusations arose, Bunch converted the shares into her own name, sold them, and placed the proceeds in a Swiss bank account.

As the court correctly charged the jury, a constructive trust can be implied:

> A constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud *or otherwise*, cannot enjoy the beneficial interest in the property without violating some established principle of equity.

(Emphasis supplied.) OCGA § 53-12-93. "A constructive trust arises not from the intent of the parties, but by equity with respect to property acquired by fraud, or although acquired without fraud, where it is against equity that the property should be retained by the one who holds it. [Cits.]" *Aetna Life Ins. Co. v. Weekes*, 241 Ga. 169, 172 (1) (244 SE2d 46) (1978). Here, an implied trust arose because the evidence suggests that when Bunch took the stock power she agreed to hold the stock in trust for the beneficiaries at the same time that her grandmother had announced her intention to make Bunch a co-executor of her estate, a fiduciary position. Cf. *Harrell v. Harrell*, 249 Ga. 170, 172 (290 SE2d 906) (1982) (resulting trust). Although neither event was formally consummated, it is against equity that Bunch should retain the stock under these circumstances, and therefore she improperly converted it to her own use

when she failed to return it.

> Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion. It is unnecessary to show that the defendant applied it to his own use, if he exercised dominion over it in defiance of the owner's right, or in a manner inconsistent with it.

(Citations and punctuation omitted.) *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (356 SE2d 877) (1987). Because the implied trust required Bunch to return the stock to the beneficiaries at the time of Pittman's death, it follows that the damages should be the value of the stock at that time.

2. Bunch contends the trial court erred by charging the words "or otherwise" within the charge on constructive trust. But these words are in the statute, and the trial court was authorized to include them to reflect the evidence presented at trial.

3. Bunch contends the estate lacked standing to pursue the claims and that the claims should have been brought by the individual beneficiaries of the alleged constructive trust. But Bunch apparently fails to recollect that two separate actions raising essentially the same allegations were consolidated for trial, thereby joining the estate and beneficiaries as plaintiffs. And Bunch has not shown how she preserved any related objection for appeal.

4. Bunch contends there was insufficient evidence to support the award of punitive damages. Bunch relies on her argument that the stock was a gift and that fraud was not shown, points resolved adversely to her above. Punitive damages are allowed if there is clear and convincing evidence that the defendant's actions showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b). Here, the jury found that the stock was not a gift and it therefore necessarily found that it was entrusted to Bunch as the purported co-executor of Pittman's estate. See *Greenway v. Hamilton*, 280 Ga. 652, 653 (1) (631 SE2d 689) (2006) (executor has fiduciary duty); *Goldston v. Bank of America Corp.*, 259 Ga. App. 690, 696 (577 SE2d 864) (2003) (implied trust creates fiduciary relationship). A breach of fiduciary duty will support an award of punitive damages. *Caswell v. Jordan*, 184 Ga. App. 755, 760 (7) (362 SE2d 769) (1987).

5. Bunch contends the award of attorney fees was error. OCGA § 13-6-11 allows recovery of attorney fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." See also *Ross v. Hagler*,

209 Ga. App. 201, 204 (3) (433 SE2d 124) (1993). The question is for the jury, and an award will be affirmed if there is any evidence to support it. *Davis v. Whitford Properties*, 282 Ga. App. 143, 145-146 (2) (637 SE2d 849) (2006). " 'Every intentional tort invokes a species of bad faith and entitles a person so wronged to recover the expenses of litigation including attorney fees.' [Cit.] Because the jury was authorized to find fraud, it was also authorized to find bad faith. [Cit.]" *St. Paul Fire &c. Ins. Co. v. Clark*, 255 Ga. App. 14, 24 (566 SE2d 2) (2002). See also *Greenway*, 280 Ga. at 655 (3).

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED JULY 7, 2008.

*Smith, Shaw & Maddox, Mather D. Graham, Jason B. Sanker*, for appellant.

*Anthony Kirkland, Albert E. Jones*, for appellees.